IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 17, 2006 Session

JOHN MELTON, R & J OF TENNESSEE, INC., AND STATE OF
TENNESSEE, ON THE RELATION OF JOHN MELTON AND R & J OF TENNESSEE,
INC.
v.
CITY OF LEXINGTON, TENNESSEE

**An Appeal from the Circuit Court for Henderson County**
**No. 03093-3     Roger A. Page, Judge**

_____

**No. W2005-01167-COA-R3-CV - Filed July 20, 2006**

_____

This case involves equitable estoppel against a municipal government.  In 1998, a real estate company developed a large residential subdivision just outside the defendant city.  The city annexed the property and provided services to the area.  The developer later became insolvent and failed to pave one of the roads in the subdivision.  Subsequently, the plaintiffs purchased lots in the subdivision fronting the unpaved road and applied to the defendant city for building permits for the lots.  The city denied the permits in part because the road in front of the lots was unpaved.  The plaintiffs filed this declaratory judgment action against the city, arguing that the city was estopped from denying the building permits on the basis of the unpaved roads, and that city was obligated to pave the road and to issue building permits to the plaintiffs.  The trial court concluded that the city was not estopped from enforcing the requirement that the road be paved and was not obligated to pave the road.  The plaintiffs now appeal.  We affirm, concluding that the evidence does not preponderate against the trial court's decision not to apply equitable estoppel under the circumstances of this case.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Thomas F. Bloom and Daniel D. Warlick, Nashville, Tennessee, for the appellants, John Melton and R & J of Tennessee, Inc.

John D. Burleson and Latosha Mason Dexter, Jackson, Tennessee, for the appellee, City of Lexington, Tennessee.

# OPINION

In 1998, Walden Blankenship purchased property west of the city limits of Lexington, Tennessee, for the purpose of developing a residential subdivision. Blankenship's interest was later transferred to a real estate development corporation called Blankenship Melton, Inc. Larry Melton ("Developer") was a director at Blankenship Melton, but apparently held no ownership interest in the company. Larry Melton became the developer for the subdivision known as the West Pointe Subdivision ("West Pointe").

At the beginning stages of the development, the Developer discussed with David Jowers ("Mayor Jowers"), the mayor of the Defendant/Appellee City of Lexington ("City"), and other members of the City Board the possibility of the City annexing the property on which West Pointe Subdivision was situated. At the time, Mayor Jowers was on the Lexington Municipal Regional Planning Commission ("Planning Commission"). The Developer claimed that the City agreed to annex the property after he and/or his company had completed certain tasks, one of which was paving the roads in the subdivision.

On October 8, 1998, the City voted to annex lots 1 through 66 of the West Pointe Subdivision, referred to as "Phase I" of the project. Meanwhile, the Developer finished paving the roads in Phase I. After the annexation, the City provided services to the lots in Phase I, including water, electricity, gas, fire hydrants, and police and fire protection. Building permits were issued for those lots.

At some point, the Developer hired Denny Bush to prepare plats of the entire subdivision. The last of the plats was completed by April 20, 1999. This included the plats for "Phase II" of the project, which were all of the remaining lots in West Pointe. The Developer submitted the plat of Phase II to Mayor Jowers. The record contains no information on any further action on the plats for Phase II.

The Developer and City officials discussed the annexation of "Phase II" of the project. Meanwhile, the Developer paved all of the streets in Phase II except for a gravel portion of Timber Ridge Drive beyond lots 94 and 95, fronting lots 100 through 117. The Developer stopped paving at that point because Dean Jackson, the manager of the City Water Department, asked him to delay finishing the paving until the utility lines were installed by the City.

On May 4, 1999, the annexation ordinance for Phase II came before the City Board for a first reading. The ordinance purported to annex "the total area of Henderson County Tax Map 72, Parcel 55 dated 8-97." A. D. Ward ("Ward"), an alderman, objected to the ordinance because the portion of the road in Phase II, referred to above, had not yet been paved. Mayor Jowers told the Board that the Developer had promised to finish paving the roads. The ordinance passed on the first reading.

As the development progressed, the Developer apparently encountered financial difficulties. In August 1999, the Developer sold Lots 100 through 117 at auction.[1] He never completed paving the portion of Timber Ridge Drive fronting lots 100 through 117.

A month later, on September 7, 1999, the annexation ordinance for Phase II came before the City Board for a second and final reading. Ward made the same objection regarding the unpaved portion of Timber Ridge Drive, but the ordinance passed by a vote of five to one. Thus, Phase II was annexed before Timber Ridge Drive was completely paved.

The Planning Commission had recommended to the City a Plan of Services resolution ("Plan of Services"), prepared by the City Planner, Chris Pate ("Pate"), for services to be extended to the annexed area.[2] The Plan of Services, by its own terms, applied to "West Pointe Subdivision Lots 66 through 99 and an 11.70 acre tract and any remainder of Henderson County Tax Map 72, Parcel 55 Dated 8-97." Lots 100 to 117 were not specifically mentioned in the Plan of Services, and those lots are not within the 11.70 acre tract mentioned in the Plan. However, lots 100 to 117 would be within the "remainder" of the map referenced in the Plan. The Plan of Services included a subsection on "Streets," which stated:

> The development is outside the planning region. Road standards cannot be enforced. Maintenance costs will be assumed when accepted by the City Board as a city street.
>
> * * *
>
> Annexation will be contingent upon the securing of a bond by the initial developers to ensure that streets are constructed to Lexington standards.

On September 7, 1999, the day the annexation ordinance for Phase II passed, the Plan of Services for the area including Phase II was adopted by the City. Also on that day, a final plat of the West Pointe Subdivision Section 5, which includes lots 100 to 117, was recorded in the Register's Office of Henderson County.

Although the Plan of Services was adopted, the City did not follow through with the recommendation that it secure a bond by the Developer to ensure the completion of the streets. By the time the City approved the Plan of Service, the property had already been sold at auction. Nevertheless, the City began providing services to Phase II, extending to lots 100 to 117, in accordance with the Plan of Services. The City installed electricity, water, natural gas, and fire

---

[1] Though irrelevant to the issues on appeal, it appears Blankenship Melton/Larry Melton violated Tennessee Code Annotated § 13-3-410(a) (1999) by selling the land in the development before obtaining approval of the Planning Commission.

[2] "It is the function and duty of a regional planning commission to make and adopt a general regional plan for the physical development of the territory of the region." T.C.A. § 13-3-402(a)(1) (1999). The Planning Commission is also empowered to "adopt regulations governing the subdivision of land within their jurisdiction." T.C.A. § 13-3-403(a) (1999).

hydrants, and the City's police department and fire departments incorporated the area into their respective jurisdictions.

The City also issued building permits for some lots in Phase II. Approximately nine permits were issued, including a permit for lot 100, one of the lots that fronted the unpaved road. The City also began to collect taxes from the new residents of Phase II, and the public began to use the area, including the unpaved portion of Timber Ridge Drive.

In March 2001, Plaintiff/Appellant Johnny Melton ("Melton"), who is unrelated to the Developer Larry Melton, and Plaintiff/Appellant R & J of Tennessee, Inc. ("R & J"), purchased ten lots in Phase II — lots 101, 102, 106, 107, 108, 109, 111, 112, 113, and 116 — from individual lot owners.[3] All of the lots purchased front the unpaved portion of Timber Ridge Drive. When the lots were originally being financed by the Developer through the Bank of Lexington ("Bank"), Melton was the Bank's branch manager and helped facilitate those loans. Because of his previous involvement with the project, Melton felt familiar with the development and believed that he did not need to conduct a title check on the properties. Melton did not investigate to determine whether the lots were within the jurisdiction of the Planning Commission or whether the plat for the subdivision had been approved by the Planning Commission.

In January 2003, Melton applied to the City building inspector, Greg Bird ("Bird"), for building permits for all ten lots. Bird consulted with City Planner Pate regarding Melton's permit request. On February 18, 2003, Pate sent a memorandum to Bird, the Planning Commission, and other City representatives advising the City not to issue the building permits to Melton because the Planning Commission had not approved a plat of the subdivision, as required by statute, and because the road in front of the lots was not paved. *See* T.C.A. § 13-3-402 (1999). He noted in the memorandum that, although the Developer had told the Planning Commission that the development was not in the Planning Commission's regional boundary, "[l]ater phases appear to have encroached into the Planning Region." Pate expressed concern over how to resolve the problems, noting difficult legal issues regarding the ownership of the streets and the responsibility for them. Pate recommended that the City obtain a legal opinion on the issues he raised in his memorandum. In accordance with Pate's recommendation, Bird denied Melton's request for the permits. After that, Melton allegedly lost several pending contracts for the sale of the lots.

On September 4, 2003, Melton and R & J (collectively, "Plaintiffs") filed a petition for a writ of mandamus against the City, alleging that the City had arbitrarily refused to pave or maintain the unpaved portion of Timber Ridge Drive. They asked the trial court to direct the City to pave the road and then issue the requested building permits to Melton. In response, the City admitted that it was responsible for the maintenance costs for public streets which have been properly dedicated and accepted by the City. It claimed, however, that the unpaved portion of Timber Ridge Drive was not a "public street" that had been properly dedicated and accepted by the City. Furthermore, the City maintained that the road fell within the local planning region and that the original Developer had

---

[3]Melton owns the majority of the stock in R & J of Tennessee, Inc.

failed to submit a subdivision plat to the Planning Commission for approval, as required by statute, and that he failed to finish paving the road, a requirement in the subdivision regulations. Because of this, the City claimed, state law did not permit it to maintain the road or issue building permits, despite the fact that the area had been annexed.

Prior to trial, the parties stipulated that a writ of mandamus was not an appropriate remedy, but that the Plaintiffs stated a claim for a declaratory judgment. Therefore, at the trial, the Plaintiffs sought a declaration from the trial court that Phase II was properly annexed, that the unpaved portion of Timber Ridge Drive was properly dedicated, and that the City is responsible for maintaining or paving the road in accordance with Lexington standards. The Plaintiffs argued that if the City were ordered to maintain the road, it would have no reason not to issue the building permits.

The trial was held on June 21, 2004. At the outset, the City Planner, Pate, testified. As background, Pate said that he had been a staff planner with the City since 1996, consulting with the Planning Commission and the City. He explained that the Planning Commission makes recommendations to the City regarding zoning and annexation issues, and that the Planning Commission has the authority to adopt, administer, and review subdivision plats that fall within its jurisdiction. One of Pate's responsibilities was to oversee subdivision regulations. He stated that anyone developing a subdivision was required to submit for approval a preliminary plat, followed by a final plat. Pate asserted that there was no indication a plat for the West Pointe Subdivision had ever been submitted for approval with the Planning Commission.

Pate said that the Planning Commission is involved in the City's annexation process by making recommendations on zoning and plans of services for the area proposed for annexation.[4] He stated that, even if the Planning Commission recommends a plan of services and an area is annexed, approval of the plat is still required. He stood by the recommendation in his February 2003 memorandum advising the City that a "refusal to follow[ ] the Subdivision Regulations [would] establish a costly precedent," because if developers thought that the regulations could be ignored, they would sell lots and develop them without providing the proper improvements under the subdivision regulations. He asserted that the Plaintiffs in this case should be required to get a remedial subdivision plat before they can be issued building permits. Pate conceded, however, that he had advised Bird that it would be difficult to refuse building permits for lots 66 to 99, because those lots were specifically referenced in the Plan of Service, and the Planning Commission, therefore, "should have figured out that there was a subdivision plat for those lots."

Pate was questioned at length about whether the planning region of the Planning Commission included West Pointe Subdivision, particularly lots 100 to 117. Different maps of the planning region of Lexington were submitted as evidence. Pate testified that the planning region had previously been defined as the corporate City limits plus a five-mile radius from those limits. In

---

[4]He described a plan of service as a general outline of services provided by the City, with time estimations and costs involved.

1988 and 1989, however, the planning region was reduced to include only a one-mile radius around the City's limits.

Pate stated that, when he recommended the Plan of Services for the annexation of Phase II in 1999, it applied only to lots 66 to 99 because he did not know that lots 100 to 117 even existed. Consequently, Pate did not intend for the Plan of Services to apply to lots 100 to 117. He explained that in the Plan he made the statement that "[t]he development is outside the planning region," because he believed at that time that the subdivision was outside the boundary, based on representations of the Developer and other circumstances. In approximately February 2003, however, Pate received a call from a building official, presumably Bird, who told him that a building permit had been requested for lots that were not named in the annexation or the Plan of Services, and he asked for a recommendation from Pate on whether the request could be granted. It later turned out that lots 100 to 117 were in fact within the regional boundaries of the Planning Commission. Since there was no approved plat for the subdivision, Pate concluded that the building permits should not be issued, and he drafted the February 2003 memorandum to that effect.

The Developer, Larry Melton, also testified. The Developer stated that he was a director of Blankenship Melton, the real estate development company that owned the property, and that he was the developer of the West Pointe Subdivision. The Developer claimed that he assembled a plat for the area and gave it to Mayor Jowers for approval, but admitted that he had no evidence that the plat was ever approved.

The Developer testified that he had had an agreement with the City that the City would annex the property after he had, among other things, paved the roads. Utility representatives, however, asked him to refrain from paving the gravel portion of Timber Ridge Drive until the utilities were laid. The City, the Developer claimed, "jumped the gun" and went ahead and annexed the property prior to him completing the roads, so he did not finish the job. He testified that he presumed that the City was accepting the subdivision "as is" — unpaved. He also allowed that he believed that, after the property was annexed, Blankenship Melton still had an obligation to pave the road. The Developer was present at the auction of the property in August 1999 and maintained that he had not told anyone that the road in front of the lots would be paved. The Developer indicated that he was insolvent and added that he had several sizeable judgments against him in other unrelated lawsuits.

Johnny Melton testified at trial. Melton said that he lived in the West Pointe Subdivision, and that he was a real estate developer himself. He said that all of the lots owned by him and R&J were purchased from individuals, not from the Developer. When Melton purchased the lots, he knew that the road in front of them was unpaved. He said that he did not have title searches conducted when he purchased the property because, as branch manager of the Bank that did the initial financing for the Developer, he had been involved in the financing and he knew that title searches were completed at that time. He did not contact any City official before purchasing the property to determine why the street was not paved, nor did he check with the City to see whether the lots were contained in an approved subdivision plat. He did, however, check to make sure a plat had been filed at the Register's Office. Melton said he had not made a claim against the Developer,

because he understood that the Developer was insolvent. Melton testified that he was told that the permits he requested were denied because the Planning Commission had not approved a plat for that section of the subdivision, and because the road was not paved.

Former Mayor Jowers testified at trial. During his tenure as Mayor, by statute, he was a member of the Planning Commission. He recalled his dealings with the Developer regarding the West Pointe Subdivision, but he did not remember being given the plat to the subdivision. He speculated that he would not have let a subdivision be approved by the Planning Commission and annexed by the City had he not at least looked at the plat. He stated that, in his experience, he had never seen a plan of service approved without the plat first being approved. Mayor Jowers recalled that the Developer had assured him that the roads in the subdivision would be paved, but at the time of trial he did not know whether the roads had, in fact, been completed. He explained that if an area is inside the planning region, streets have to be built according to the Planning Commission standards. If an area is outside the planning region, a developer does not need to consult with the Planning Commission but deals only with the county highway department.

The director of City utilities, Dean Jackson ("Jackson"), testified as well. During the relevant time period, Jackson was the general manager of the City Water Department. He confirmed that some utilities had been extended along the gravel portion of Timber Ridge Drive according to an arrangement that the City had with the Developer. He explained that it was to the City's benefit to have the utilities laid before the roads were paved in order to avoid cutting through the road or driveways at a later time. That completed the evidence submitted at trial.

On June 22, 2004, the trial court issued a letter opinion. In that opinion, the trial court determined that the City was equitably estopped from requiring Plaintiffs to pursue a remedial platting process in order to obtain building permits for the lots in question. The trial court reasoned that several permits had already been issued in Phase II of the development, including one for lot 100 where no paved road exists, and that the City had already provided various services to the area, had collected real estate taxes from the area, and had generally benefitted from the annexation of the area. The trial court also relied on the fact that "the developers partially complied with applicable law by filing a copy of the subdivision plat in the Register's Office of Henderson County." Thus, the trial court concluded:

> [I]t would be unfair to require Petitioners or any other similarly situated lot owners to go through a remedial platting process when other lot owners in the same phase of the subdivision have not done so. The principal of estoppel clearly applies to this situation. Exceptional circumstances exist such that the doctrine of estoppel should be invoked.

In addition, the trial court declared that all of the streets and easements in the West Pointe Subdivision had been dedicated by the original Developer to the City by estoppel, and that the City owned the streets in the West Pointe Subdivision.

The trial court further held, however, that Melton was required to fulfill all other prerequisites for obtaining a building permit, including building and paving "a suitable street to give access to the disputed lots . . . ." The trial court determined that the City was not required to pave the remainder of Timber Ridge Drive, reasoning that the Plaintiffs knew that the street was unpaved when they bought the lots, and that to require the City to do so under these circumstances would be a windfall for the Plaintiffs. The trial court held that the road in question "must be built according to 'Lexington standards' before the City of Lexington shall be required to issue building permits."[5] The trial court said that its decision was not affected by the fact that permits were granted for other lots in Phase II, because the lots for which permits were granted, except for one, were on paved roads. Although the City owned the roads in the subdivision, the trial court stated, the City was not required to issue building permits for the lots in question until the street was completed to Lexington standards, *i.e.*, paved. The trial court found that it was unnecessary to determine whether the lots in question were inside or outside of the boundaries of the Planning Commission, and noted that those boundaries were "at least ambiguous and disputable."

On May 6, 2005, the trial court entered an order consistent with its letter opinion and incorporating it by reference. From this order, the Plaintiffs now appeal.

On appeal, Plaintiffs state the issue as, "Whether the trial court erred in holding that [the] doctrine of estoppel applies only to the platting requirements and not to the other subdivision regulations, including the requirement that the roads be paved and the issuance of building permits." They seek a declaration that the City is responsible for maintaining the unpaved road in Phase II according to "Lexington standards," *i.e.*, paving the road, and that the City should not be permitted to deny them building permits based on the fact that the roads are unpaved. In response, the City does not challenge the trial court's application of equitable estoppel to the platting requirements. It asserts that the trial court appropriately applied the doctrine sparingly and rationally, and it contends that the trial court was correct in refusing to apply the doctrine with respect to the building permits, to the paving requirement, and to the City's responsibility for maintaining and/or paving the road in question.

We review the trial court's findings of fact *de novo*, with a presumption that the trial court's factual findings are correct, unless the evidence preponderates otherwise. T.R.A.P. 13(d). We review the trial court's conclusions of law *de novo*, with no such presumption of correctness. ***Id.***

Under Tennessee law, the doctrine of equitable estoppel is generally disfavored. ***Faust v. Metro. Gov't of Nashville***, No. M2003-00296-COA-R3-CV, 2006 WL 1184206, at *21 (Tenn. Ct. App. May 3, 2006); ***Shahan v. Franklin County***, No. M2002-00725-COA-R3-CV, 2003 WL 23093836, at *3 (Tenn. Ct. App. Dec. 30, 2003). A party seeking to invoke the doctrine of equitable estoppel has the burden of proving that the defendant (1) engaged in conduct which amounts to a false representation or concealment of material facts or, at least, conduct which is calculated to

<hr>

[5]Although the parties appear to assume that maintaining the road according to Lexington standards means that the road should be paved, we do not decide that issue.

-8-

convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) had an intent or an expectation that such conduct would be acted upon by the other party; and (3) had actual or constructive knowledge of the real facts. *Consumer Credit Union v. Hite*, 801 S.W.2d 822, 825 (Tenn. Ct. App. 1990). The party seeking to invoke the doctrine must (1) have a lack of knowledge and lack the means to gain knowledge of the truth; (2) have relied upon the conduct of the party who is estopped; and (3) have acted in reliance on the estopped party's conduct so as to have prejudicially changed the position of the party claiming estoppel. *Faust*, 2006 WL 1184206, at *21. The Supreme Court has explained that "[i]t is essential to estoppel that the person claiming it was himself not only destitute of knowledge of the facts, but without available means of obtaining such knowledge; for there can be no estoppel where both parties have the same means of ascertaining the truth." *Rambeau v. Farris*, 212 S.W.2d 359, 361 (Tenn. 1948), *quoted in Faust*, 2006 WL 1184206, at *22.

In addition, the doctrine of equitable estoppel is not applicable to a local government to the same extent as it might apply to a private individual. *Shahan*, 2003 WL 23093836, at *3. Rather, the doctrine of equitable estoppel applies to a governmental subdivision only in "very exceptional circumstances." *Id.*; *see Paduch v. City of Johnson City*, 896 S.W.2d 767, 772 (Tenn.1995). Such circumstances are those in which "the public body took affirmative action that clearly induced a private party to act to his or her detriment, as distinguished from silence, non-action or acquiescence." *Shahan*, 2003 WL 23093836, at *3 (quoting *Bledsoe County v. McReynolds*, 703 S.W.2d 123, 125 (Tenn. 1985)). This Court has also held that "equitable estoppel may be invoked against governmental agencies only when the agency induced the party to give up property or a right in exchange for a promise." *Id.* at *4 (citing *Thompson v. Dep't of Codes Admin.*, 20 S.W.3d 654, 664 (Tenn. Ct. App. 1999); and *Elizabethton Hous. & Dev. Agency, Inc. v. Price*, 844 S.W.2d 614, 618 (Tenn. Ct. App. 1992)). Therefore, "a party may invoke equitable estoppel against a governmental agency only when the facts clearly establish the existence of an implied contract or that the government has induced a party to relinquish a cause of action." *Id.*

In this case, the Plaintiffs argue that the trial court correctly applied the doctrine of equitable estoppel to relieve them of the platting requirements, but erred in refusing to apply the doctrine to relieve them of the subdivision regulation requiring that the road be paved. The Plaintiffs contend that the equities of the case require that the City be required to maintain the unpaved road according to Lexington standards, *i.e.*, pave the road, and to issue building permits for the lots in question.

In support of the argument that the City should be required to pave the road, the Plaintiffs assert that it was grossly unfair for the Planning Commission to first state that it had no jurisdiction over the road in question at the time of the annexation in 1999, and then four years later declare that it had such jurisdiction for the purpose of enforcing the subdivision regulation that the road be paved. The Plaintiffs argue that the City knew its only remedy to get the road paved was against the insolvent Developer, and so it attempted to impose the Developer's obligation on the Plaintiffs by refusing to pave the road and refusing to grant the Plaintiffs building permits until the road was paved. The Plaintiffs imply that the Planning Commission and the City conspired to impose the obligation to pave the road on the owners of the lots by asserting jurisdiction over lots 100 to 117

for the first time in February 2003. They characterize Pate's allegedly inconsistent representations as a flimsy, transparent, after-the-fact attempt to assert jurisdiction where none existed. As of September 1999, the Plaintiffs argue, any reasonable person would have thought that the Planning Commission did not have jurisdiction over the area, and that the original Developer was obligated to pave the road. Therefore, the Plaintiffs maintain, they had a reasonable expectation that they would be able to acquire building permits for their lots, especially since the City had already issued such a permit for lot 100.

The Plaintiffs do not make a substantial argument that lots 100 to 117 are, in fact, outside the planning region of the Planning Commission. The only evidence at trial on the subject was Pate's testimony and the physical evidence submitted in support of his testimony showing that the lots were inside the Planning Region. The Plaintiffs' argument focuses more on the timing of the change in Pate's position, insinuating that Pate and the City representatives asserted jurisdiction over the property in a disingenuous effort to avoid paving the street. The trial court apparently found no such sinister motives on the part of these officials, and we cannot say that the evidence preponderates against its conclusion.

In holding that the City was estopped from enforcing the platting requirement, the trial court relied on the fact that this requirement had been not been enforced against other property owners in the subdivision, and also that various services were already being provided to the area and taxes had been collected from the area. In addition, the Developer partially performed by filing the plat in the county Register's Office and this was relied upon by the purchasers of the lots. Therefore, it was not obvious to the Plaintiffs that the platting requirement had not been met.[6]

In contrast, regarding the paving requirement, the fact that the road was unpaved was obvious, and the Plaintiffs knew that the road was unpaved at the time of purchase. Despite knowledge of this fact, the Plaintiffs did not seek information regarding who had the responsibility to pave the road. The City did not represent to the Plaintiffs that it intended to pave the road, nor did any of its agents promise that the road would be completed. The undisputed evidence shows that the City expected the Developer to pave the road, and that the Developer was aware of this obligation but failed to follow through. In sum, the City took no "affirmative action that clearly induced [Plaintiffs] to act to his or her detriment," an element which is required to apply the doctrine of equitable estoppel against a governmental entity such as the City. *Shahan*, 2003 WL 23093836, at *3 (refusing to apply the doctrine when developer claimed that county representative promised to take over responsibility of the road under certain conditions). Therefore, we find no error in the trial court's decision to decline to require the City to pave the road in question based on the doctrine of equitable estoppel.[7]

---

[6]The trial court's holding in this regard is not challenged on appeal.

[7]At oral argument, the Plaintiffs asserted that the City should be required to maintain the road based on an unidentified City ordinance that requires the City to maintain roads that have been dedicated. No such argument was made in their appellate brief. The argument on appeal is based solely on application of the doctrine of equitable estoppel.

(continued...)

In a related argument, the Plaintiffs contend that the trial court erred in refusing to apply the doctrine of equitable estoppel to estop the City from enforcing the paving requirement as a prerequisite for the issuance of building permits. In this argument, the Plaintiffs contend that they relied on Pate's statement in the 1999 Plan of Services that "[t]he development is outside the planning region," and that "[r]oad standards can not be enforced." However, there is no evidence in the record that the Plaintiffs knew about the statement in the 1999 Plan of Services, or that Pate's statement caused them to expect that they would receive building permits in spite of the unpaved road. Again, the City made no promises regarding the issuance of building permits to the Plaintiffs or any other similarly situated landowner. The fact that the City erroneously issued a permit to lot 100, which is also unpaved, is a factor, but not an "extreme circumstance" or "affirmative action" that would justify estopping the City from enforcing the requirement for the other landowners. It is undisputed that the Plaintiffs were aware when they purchased the lots that the road was not paved. Under all of the circumstances, we find no error in the trial court's decision to decline to apply the doctrine of equitable estoppel to prevent the City from enforcing the paving requirement as a prerequisite for the issuance of building permits. All other issues not addressed in this Opinion are pretermitted.

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellants John Melton and R & J of Tennessee, and their surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

---

[7](...continued)
Thus, any argument based on the unidentified ordinance must be deemed to have been waived. *See Childress v. Union Realty Co.*, 97 S.W.3d 578 (Tenn. Ct. App. 2002).